1:21CV273

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ) | |
| [UNDER SEAL], ) | |
| ) | |
| Plaintiffs, ) | |
| ) | COMPLAINT |
| v. ) | |
| ) | JURY TRIAL DEMANDED |
| [UNDER SEAL], ) | |
| ) | Filed under Seal Pursuant to |
| Defendant. ) | 31 U.S.C. § 3730(b)(2) |
| _____ ) | |

FILED IN CAMERA AND UNDER SEAL

FILED APR 0 1 2021
IN THIS OFFICE
Clerk U.S. District Court
Greensboro, N.C.

**A.J. CEBERIO**
aceberio@ftwcb.com
**BRADLEY ROONEY**
brooney@ftwcb.com
**STUART BROOKS**
sbrooks@ftwcb.com
FREEDMAN THOMPSON WITT CEBERIO & BYRD, PLLC
210 South Cherry St.
Winston-Salem, NC 27101
Phone: 336.725.8323
Fax: 336.722.5218

**MICHAEL A. YODER\*** [DC Bar No. 1600519]
THE LAW OFFICE OF MICHAEL A. YODER, PLLC
2300 Wilson Blvd., Suite 700
Arlington, VA 22201
Phone: 571.234.5594
Fax: 571.327.5554
michael@yoderesq.com
*\*pro hac vice forthcoming*


*Counsel for Plaintiff-Relator, Scott Johnston*

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ) <br> SCOTT JOHNSTON, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> BANK OF AMERICA CORPORATION, ) <br> ) <br> Defendant. ) <br> _____ ) | COMPLAINT <br><br> JURY TRIAL DEMANDED <br><br> Filed under Seal Pursuant to <br> 31 U.S.C. § 3730(b)(2) |

## I. INTRODUCTION

1. This is a qui tam action brought by Relator, Scott Johnston on behalf of the United States of America to recover treble damages and civil penalties under the False Claims Act, as amended, 31 U.S.C. § 3729 *et seq.*, ("the FCA" or "the Act") arising from false and fraudulent records, and false statements material to false and fraudulent claims, made, used and caused to be made, used and presented by defendant Bank of America Corporation ("BofA" or "Defendant"), to the United State Government under the Community Reinvestment Act of 1977 ("CRA").

2. Prior to 1977, banks located in low- and moderate-income ("LMI") neighborhoods and minority communities engaged in the practice of "redlining" as a means to systematically discriminate against LMI communities and limit the flow of available capital for homeownership and small businesses. As a result, LMI communities were denied the economic and business development opportunities afforded to more affluent, predominantly white communities.

3. To redress this discriminatory effect–and the seemingly-apparent intent behind redlining–the CRA was enacted, in part, to impose on banks a "continuing and affirmative

3

obligation to help meet the credit needs of the local communities in which they are chartered." 12 U.S.C. § 2901(a)(3). The CRA instructs the Office of the Comptroller of the Currency ("OCC"), the Federal Deposit Insurance Corporation ("FDIC"), and the Board of Governors of the Federal Reserve System ("Federal Reserve") to evaluate CRA performance, with a given bank's charter dictating which agency assesses that bank. *See* § 2902(1). Specifically, the OCC, FDIC, and the Federal Reserve "shall assess" a financial institution's "record of meeting the <u>credit of its entire community, including low- and moderate-income neighborhoods</u> . . . ." § 2903(a)(1) (emphasis added). These assessments must separately evaluate each metropolitan area in which a regulated bank maintains one or more domestic branch office or deposit-taking facilities, such as an ATM. See §§ 2906(b)(1)(B), (e)(1).

4. The overarching principle behind the CRA holds true today just as it did in the decades leading up to the passage of the CRA: banks do not want to lend to LMI communities for fear of default and loss of revenue. However, in order to maintain already-existing branches and deposit-taking facilities located in LMI communities, banks–including Bank of America–must comply with the CRA. But, if the size and number of LMI communities was diminished, Bank of America would be able to mitigate lost revenue stemming from defaults on subprime mortgages while still complying with the requirements of the CRA.

5. On or about June 21, 2019, BofA launched a program marketed as its "Down Payment Grant Program" ("DPGP"), a program which "offers a grant equaling 3% of the home purchase price, up to $10,000, to be used for a downpayment in select markets [and] … <u>the funds do not require repayment</u>."[1] (emphasis added). To qualify under the DPGP, "[q]ualified borrowers must meet eligibility requirements," such as being "owner-occupants" and "purchasing a home

---

[1] Bank of America, *Bank of America's Community Homeownership Commitment*™, https://www.bankofamerica.com/mortgage/affordable-housing-programs/ (last visited Mar. 28, 2021).

4

within a certain geographical area." The "[m]aximum income" permitted "[f]or properties not located in a low-to-moderate-income census tracts . . . is 80% of the Federal Financial Institutions Examination Council Area Median Income" while no income limits apply "[f]or properties located in low-to moderate-income census tracts." Such requirements squarely mirror the community reinvestment obligations imposed on financial institutions pursuant to the Community Reinvestment Act ("CRA"), 12 U.S.C. § 2901 *et seq*.

6. Residential appraisers, whose job descriptions are standardized nationwide, must adhere to a number of corporate policies and state and federal guidelines. Adherence to these guidelines is not optional; residential appraisers who fail to adhere to these guidelines are penalized. When issuing a mortgage, Bank of America's "Property and Appraisals" Guidelines require its residential appraisers to, *inter alia*, evaluate residential properties and attach the appraisal report as part of the loan package.

7. As part of the Uniform Mortgage Data Program ("UMDP"), the Federal Home Loan Mortgage Corporation ("Freddie Mac") and the Federal National Mortgage Association ("Fannie Mae") have worked together at the direction of their regulator, the Federal Housing Finance Agency ("FHFA"), to develop the Uniform Appraisal Dataset ("UAD") and the Uniform Collateral Data Portal ("UCDP") in an effort to enhance the quality and consistency of appraisal data and promote the collection of electronic appraisal data. Pursuant to the UAD, Freddie Mac has promulgated standardized appraisal report forms that are required to be completed for each loan issued by financial institutions, such as Bank of America. The UAD also defines all fields required for an appraisal submission for specific appraisal forms and standardizes definitions and responses for a key subset of fields.

5

8.      Section 5601.02(b) of the Freddie Mac Guide states in pertinent part: "The 'Contract' section of the appraisal report must include the results of the appraiser's analysis of the contract for sale, the contract price, the date of contract and to acknowledge if the property seller is the owner of public record, and the data source(s) used. <u>The appraisal report must also include the total dollar amount and description of any financial assistance</u> (loan charges, sales concessions, gift or <u>down payment assistance</u>, etc.) to be paid by any party on behalf of the Borrower."[2] (emphasis added).

9.      Following the housing market collapse of 2008, Congress passed the Housing and Economic Recovery Act of 2008 ("HERA"), which in turn created the FHFA and vested in it the "authority over Fannie Mae, Freddie Mac, the Federal Home Loan Banks, and the Office of Finance." 12 U.S.C. § 4511(a), (b). Notably, "[a]ll assistance provided from the Housing Trust Fund (i.e., Freddie Mac backed mortgages) shall be considered Federal financial assistance." *Id.* § 4568.

10.     In light of the banks' obligations to comply with the FHFA requirements and complete the appraisal reports, 18 U.S.C. §§ 1001 and 1104 also impose upon BofA appraisers—and Bank of America itself—the obligation to truthfully report and refrain from making materially false statements on government documents, such as the Appraisal Report Forms promulgated under the UAD and provided in accord with Freddie Mac insured mortgages.

11.     As Relator Mr. Johnston witnessed firsthand, BofA consistently lends to borrowers in LMI neighborhoods under its DPGP while intentionally and fraudulently representing that no financial assistance has been provided by any party on behalf of the borrower, when in fact BofA itself is providing financial assistance to the borrower.

---

[2] Freddie Mac, *Section 5601.12: Property Description and Analysis*, SINGLE-FAMILY SELLER/SERVICER GUIDE (Dec. 02, 2020), https://guide.freddiemac.com/app/guide/section/5601.12.

6

12. Upon information and belief, BofA reported to the federal government that no financial assistance had been provided to the borrower on every DPGP loan, despite allowing each borrower financial assistance in the form of a down payment assistance grant on every single DPGP loan reported between DPGP's inception and date of filing.

13. *Qui tam* Relator Mr. Johnston seeks through this action to recover damages and civil penalties arising from Defendant's making or causing to be made false or fraudulent records, statements and claims in connection with Defendant's knowing and material breach of the CRA and the UMDP and its unlawful violation of the False Claims Act. Defendant knew and continued to know that its false scheme of lending to LMI neighborhoods through its DPGP, then fraudulently representing that no financial assistance had been provided, would satisfy its required quota while fraudulently inflating property values thereby increasing its collateral.

## II. JURISDICTION AND VENUE

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Plaintiff-Relator establishes subject matter jurisdiction under 31 U.S.C. § 3730(b).

15. Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint for which Mr. Johnston is not an "original source," and all material information relevant to his allegations were provided to the United States Government prior to filing of this Complaint, in satisfaction of 31 U.S.C. § 3730(e)(4)(B).

16. This Court has personal jurisdiction over the Defendant and is a proper venue pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because these sections authorize nationwide service of process and because the defendants have minimum contact with the United

States. Moreover, the Defendant can be found in, resides, transacts, or has transacted business in the Middle District of North Carolina. Further, the DPGP is available, and upon information and belief, is utilized within the Middle District of North Carolina. At all times relevant, Defendant regularly conducted substantial business within and made significant revenue within the Middle District of North Carolina.

17. Venue is proper in this District pursuant to 31 U.S.C § 3732(a) because the Defendant can be found in and transacts or has transacted business in the Middle District of North Carolina. At all times relevant to this Complaint, Defendant regularly conducted substantial business within the Middle District of North Carolina and made significant sales within the Middle District of North Carolina.

### III. PARTIES

18. Realtor Scott Johnston is an adult citizen domiciled in the State of Arizona and at all times relevant, an employee of Defendant.

19. Defendant Bank of America Corporation ("BofA") is a Delaware corporation, with its principal offices and headquarters being located at 100 North Tryon Street, Charlotte, North Carolina.

### IV. BACKGROUND

**A. The Community Reinvestment Act of 1977 ("CRA")**

20. The Community Reinvestment Act of 1977 was promulgated to encourage financial institutions to help meet the credit needs of the communities in which they do business, including low- and moderate-income ("LMI") neighborhoods. Three federal banking agencies, or regulators, are responsible for the CRA: the Federal Deposit Insurance Corporation ("FDIC"), the Federal Reserve Board ("FRB"), and the Office of the Comptroller of the Currency ("OCC"). Banks that

8

Case 1:21-cv-00273-TDS-JLW   Document 1   Filed 04/01/21   Page 8 of 17

have CRA obligations are supervised by one of these three regulators. Each regulator has a dedicated CRA site that provides information about the banks they oversee and those banks' CRA ratings and performance evaluations.

21. The CRA further requires each federal bank regulator to periodically evaluate a financial institution's records to determine the extent to which the bank is helping meet the credit needs of its entire community, *including its LMI neighborhoods*. A financial institution's performance evaluation is also considered when reviewing applications for deposit facilities, including mergers and acquisitions.

22. Financial institutions' CRA record is favorably considered when financial institutions seek federal regulatory approval in a variety of contexts.

23. Prior to the CRAs enactment, many banks did not market their lending products and financial services to LMI neighborhoods. This practice was known as "redlining," a term attributed to the color-coded maps developed by the New-Deal-era Home Owner's Loan Corporation that had a large minority population, poorer households, and older housing stock. The CRA was promulgated in substantial part to eliminate the discriminatory "redlining" practice.

**B.     The Down Payment Grant Program**

24. BofA launched the "Down Payment Grant Program" ("DPGP") on or about June 21, 2019. The DPGP "offers a grant equaling 3% of the home purchase price, up to $10,000, to be used for a downpayment in select markets [and] . . . [t]he funds do not require repayment."[1] (emphasis added).

**C.     Freddie Mac and Fannie Mae**

9

25. The Federal Home Loan Mortgage Corporation ("Freddie Mac") and the Federal National Mortgage Association ("Fannie Mae") were both created by Congress in an effort to provide liquidity, stability, and affordability to the mortgage market. Fannie Mae was first chartered in 1938 with Freddie Mac being chartered in 1970.

26. Both Freddie Mac and Fannie Mae provide consistent and reliable liquidity by buying mortgages from lenders like BofA and either holding those mortgages in their portfolios or packaging the loans into mortgage-backed securities ("MBS") that are later sold. By selling loans to Freddie Mac or Fannie Mae, thousands of banks, savings and loans, and mortgage companies have ready access to substantial cash, thereby creating funds for further lending. Such practices provide individuals, families, and investors access to a stable supply of mortgage money.

27. Once Freddie Mac and Fannie Mae package their mortgages into MBS, they then guarantee the timely payment of principal and interest on the underlying mortgages and seek investment from the secondary mortgage market. The end result is a secondary mortgage market that is even more liquid and helps to lower the interest rates paid by homeowners and other mortgage borrowers.

### D. Realtor's Whistleblower Claim

28. On or about April 1, 2019, Mr. Johnston began his career at BofA, first as a "Financial Center Lending Officer," and later, as a "Credit Solutions Advisor." During the regular course of his duties, Mr. Johnston discovered what he initially believed to be an error in the way BofA was reporting whether or not financial assistance had been provided to its borrowers. However, Mr. Johnston then looked back and discovered that every single file he pulled indicated that financial assistance had not been provided, when in fact the borrowers were a part of the DPGP being offered by BofA.

29. In approximately August of 2019, Mr. Johnson notified his direct manager, Dana Klarr, of his findings and advised Ms. Klarr that he believed there was potential fraud occurring in regard to the DPGP. Ms. Klarr did not take any action thereafter.

30. Due to this inaction, Mr. Johnston again raised his concerns with Ms. Klarr, to which Ms. Klarr instructed Mr. Johnston to notify Sherri Colter, the Sales Operations Manager, if Mr. Johnston "felt so strongly" about addressing the fraud.

31. Mr. Johnston then brought the fraudulent activity to Ms. Colter's attention but was met with statements including *inter alia*: "[i]f you value your job, you will choose a different path and not pursue the issue"; "pleading ignorance is best"; and "we as a firm need to satisfy our Community Reinvestment Act quota." Mr. Johnston promptly reported the suspected fraud and his encounters with Ms. Klarr and Ms. Colter to the Office of Comptroller of Currency and the Bank of America Ethics and Compliance Hotline thereafter.

32. In September 2019 and in response to his report to the OCC and BofA's Ethics and Compliance Hotline, BofA retaliated by restricting Mr. Johnston's server and file access to the point Mr. Johnston could not even access the files he needed to perform his daily duties. Left with no other option, Mr. Johnston filed a formal complaint concerning the lockout.

33. At the request of BofA, on or about November 14, 2019, Relator sent an email with numerous attachments regarding his formal complaint to BofA Vice President and Employee Relations Consultant, Andrea Williams. Ms. Williams responded by informing Relator that she would forward his information to in-house counsel.

34. In approximately March or April 2020, BofA's in-house legal department contacted Mr. Johnston via a direct message on Skype regarding his September 2019 complaint. When Mr. Johnston asked about the fraud, BofA's legal team refused to answer any questions and instead,

11

advised that someone else would contact Mr. Johnston for a follow-up. Mr. Johnston never received a follow-up thereafter.

### V. CONDITIONS PRECEDENT TO FILING LAWSUIT

35. Pursuant to 31 U.S.C. § 3279 *et seq*, this Complaint is to be filed *in camera* and under seal and is to remain under seal for a period of at least sixty (60) days and shall not be served on Defendant until the Court so orders. Further, the United States government may elect to intervene and proceed with the action within the sixty (60) day timeframe after it receives both the Complaint and the material evidence submitted to it.

36. This lawsuit is not based on prior public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, investigation; in the news media; or in any other location as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4), but rather on information from Relator.

37. In the alternative, to the extent there has been a public disclosure unknown to Relator Johnston, he is an original source under the aforementioned statute. As more fully set forth in this Complaint, Relator has direct and independent knowledge of the information on which the allegations herein are based and witnessed directly the fraudulent actions and representations by Bank of America against the United States, its departments, or agents.

38. Relator has voluntarily provided all of the material information alleged herein to the Federal government before filing this action based on said information.

39. Contemporaneous with filing this Complaint, Relator is serving a copy of same upon the United States, together with the aforementioned verbal and written disclosure statements

setting forth and enclosing all material evidence and information he possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

40. Relator has complied with all other conditions precedent to bringing this action.

## VI. ALLEGATIONS SAME TO ALL COUNTS

41. The False Claims Act ("FCA") makes liable any person who: (i) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; or (ii) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B). The FCA further states that any person who violates the Act "is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000] . . . plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a); *see* 28 C.F.R. § 85.3(a)(9).

## COUNT I
## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A) - Causing False Claims

42. Relator incorporates by reference all of the above paragraphs of his Complaint as if fully set forth herein.

43. Relator seeks relief against BofA under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. § 3729(a)(1) (2006), and, as amended, Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

44. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

45. Through the acts described above, since the inception of Bank of America's Down Payment Grant Program ("DPGP"), BofA has knowingly and intentionally presented or caused to

13

be presented, to an officer or employee of the Government, false or fraudulent claims, records, or other materials for payment or approval resulting in significant payments of false claims by the United States Government to Defendant BofA.

46. Every time BofA misrepresented the financial assistance they had actually given borrowers through the DPGP, BofA caused federal regulators and other economic actors such as state licensed appraisers to rely on erroneous data.

47. These misrepresentations allowed indeterminate financial actors and stakeholders to rely on erroneous data from which to act upon, including assumptions about the creditworthiness of DPGP grant recipients.

48. Upon information and belief, these misrepresentations and fraudulent representations by BofA to the federal government and federal regulators currently send and continue to send shockwaves throughout the economy which are indeterminate in scale and will be proven at trial.

49. Upon information and belief, BofA's fraudulent reporting activity caused and continues to cause micro and macroeconomic damage to the United States government and its citizens to an extent to be proven at trial.

50. Each time BofA filled out the relevant appraisal report form pursuant to the Uniform Appraisal Dataset ("UAD") and made a misrepresentation that no financial assistance had been provided, BofA caused the presentation of a false or fraudulent claim.

51. By reason of BofA's acts and their fraudulent scheme, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

## COUNT II
## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(B) - Use of False Claims

52. Relator incorporates by reference all of the above paragraphs of his Complaint as if fully set forth herein.

53. Relator seeks relief against BofA under Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), or in the alternative, under Section 3729(a)(2) of the False Claims Act.

54. Through the acts described above, since the inception of BofA's Down Payment Grant Program ("DPGP"), Defendant BfoA has knowingly, or acting in deliberate ignorance and/or with reckless disregard for the truth, made, used, or caused to be made or used false records and statements, and omitted material facts to induce the Government to pay or approve such false or fraudulent claims.

55. Every time BofA misrepresented the financial assistance BofA gave to its borrowers through the DPGP, BofA caused federal regulators and other economic actors such as state licensed appraisers to rely on erroneous data.

56. These misrepresentations allowed indeterminate financial actors and stakeholders to rely on erroneous data from which to act upon, including assumptions about the creditworthiness of DPGP grant recipients.

57. Upon information and belief, these misrepresentations and fraudulent representations by BofA to the federal government and federal regulators currently send and continue to send shockwaves throughout the economy which are indeterminate in scale and will be proven at trial.

15

58. Upon information and belief, BofA's fraudulent reporting activity caused and continues to cause micro and macroeconomic damage to the United States government and its citizens to an extent to be proven at trial.

59. By reason of BofA's acts and their fraudulent scheme, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgement against Bank of America, as follows:

A. That Defendant, Bank of America, cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq*;

B. That this Court enter a judgment against Defendant BofA in an amount equal to three times the amount of damages the United States has sustained because of the Defendant's actions, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation of 31 U.S.C. § 3729, *et seq*;

C. That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3729(d) of the False Claims Act;

D. That Relator be awarded all costs of this action, including attorneys' fees, costs and expenses pursuant to 31 U.S.C. § 3729(d); and

E. That the United States and Relator be granted all such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator hereby demands a trial by jury.

Dated: March 31, 2021.

FREEDMAN THOMPSON WITT CEBERIO & BYRD, PLLC

By: _____
**A.J. CEBERIO**
aceberio@ftwcb.com
**BRADLEY ROONEY**
brooney@ftwcb.com
**STUART BROOKS**
sbrooks@ftwcb.com
FREEDMAN THOMPSON WITT CEBERIO & BYRD, PLLC
210 Cherry St. S.
Winston-Salem, NC 27101
Phone: 336.725.8323
Fax: 336.722.5218


THE LAW OFFICE OF MICHAEL A. YODER, PLLC

By: _____ w/ express authority to Bradley Rooney
**MICHAEL A. YODER**\* [DC Bar No. 1600519] to sign on
THE LAW OFFICE OF MICHAEL A. YODER, PLLC behalf of
2300 Wilson Blvd., Suite 700                    Michael Yoder.
Arlington, VA 22201
Phone: 571.234.5594
Fax: 571.327.5554
michael@yoderesq.com
*pro hac vice forthcoming*

*Counsel for Plaintiff-Relator, Scott Johnston*

17